## CONSTRUCTION OF THE SALARY ACT WITH REFERENCE TO FEES RECEIVED BY STATE OFFICERS IN NATURALIZATION CASES.

Common Pleas Court of Cuyahoga County.

STATE OF OHIO, EX REL CYRUS LOCHER, PROSECUTING ATTORNEY
OF CUYAHOGA COUNTY, V. CHARLES S. HORNER AND
THE BANKERS SURETY COMPANY,

Decided, September 22, 1914.

*Office and Officer—County Clerks Have No Title to Fees Earned in
Naturalization Cases—Must Account for Fees Collected by Virtue
of Federal Laws as Well as Under the Laws of the State.*

A county clerk is not entitled under the present Ohio salary law to
retain as an emolument of his office one-half of the fees up to
$3,000 received for services in matters pertaining to naturalization
but he must account to the state for such fees in the same man-
ner as for fees received for services rendered under the laws of
the state.

*Cyrus Locher* and *Fred W. Green,* for plaintiff.
*Goulder, Day, White, Garry & Duncan,* contra.

COLLISTER, J.

The relator files his petition against the defendants in two
causes of action. It avers the relator is the duly elected, quali-
fied and acting prosecuting attorney of Cuyahoga county; the
defendant, Charles S. Horner, for the period commencing upon
the first Monday in August, 1911, and continuing for two years
thereafter, was the duly elected, qualified and acting clerk of
the court of common pleas of said Cuyahoga county, Ohio; the
defendant, the Bankers Surety Company, is a corporation or-
ganized and existing under the laws of the state of Ohio, and
authorized to do business within the state of Ohio; that prior
to entering upon the duties of his office as such clerk, said Hor-
ner executed his official bond in the penal sum of $20,000, with

the Bankers Surety Company as surety thereon, which said bond and the surety thereon was duly approved by the board of commissioners of Cuyahoga county, and such approval endorsed upon said bond, and said bond duly filed with the treasurer of said county, a copy of which bond is attached to the petition, and is in words and figures following:

"KNOW ALL MEN BY THESE PRESENTS, that we, Charles S. Horner, as principal, and the Bankers Surety Company, of Cleveland, Ohio, as surety, are held and firmly bound unto the state of Ohio in the penal sum of $20,000, for the payment of which well and truly to be made we do hereby jointly and severally bind ourselves, our heirs, executors, administrators and successors, firmly by these presents, as witnessed by our hands and seals hereunto affixed this eighth day of July, in the year of our Lord one thousand nine hundred and eleven.

"THE CONDITION of this obligation is such that, whereas, the said Charles S. Horner was, on the 8th day of November, in the year of our Lord one thousand nine hundred and ten, duly elected to the office of clerk of the court of common pleas of the county of Cuyahoga, Ohio, to hold said office for the term of two years, beginning on the first Monday of August next after his election and until his successor is chosen and qualified; now if the said Charles S. Horner shall enter and record all the orders, decrees, judgments and proceedings of the court of which he is by law the clerk, and faithfully and impartially perform the duties of said office, and pay over accordig to law all moneys which come into his hands by virtue of said office, then this obligation shall be void, otherwise to be and remain in full force and virtue.

(Seal.)                          CHARLES S. HORNER.
"Attest                  THE BANKERS SURETY COMPANY,
    "S. W. WILKINSON,            by H. B. SPRAGUE, V. Prest.
        "Asst. Secretary."

The petition then sets forth the relator's first cause of action as follows:

"FIRST CAUSE OF ACTION: By virtue of the provisions of an act of Congress enacted June 29, 1906 (Vol. 24 Statutes at Large, page 596) courts of common pleas in the state of Ohio are given jurisdiction to naturalize aliens, and clerks of courts of common pleas are required to perform certain duties in con-

nection with the naturalization of aliens, and to charge, collect and account for certain fees for the performance of said services, as follows:

"1. For receiving and filing declaration of intention and issuing a duplicate thereof, $1.

"2. For making, filing and docketing the petition of an alien for admission as a citizen of the United States, and for the final hearing thereon, $2.

"3. For entering the final order and the issuance of a certificate of citizenship thereunder, if granted, $2.

"It is further provided in said act that such clerk collecting such fees may retain one-half of the fees collected by him in such naturalization proceedings, up to the sum of $3,000 in any one year, the balance of such fees being required to be accounted for and paid over to the United States Bureau of Immigration and Naturalization.

"For the period during which said Charles S. Horner was clerk of the court of common pleas in and for Cuyahoga county, as hereinbefore recited, said Charles S. Horner, as such clerk of the court of common pleas, and by virtue of said office, performed the services required to be performed by the clerk of the court of common pleas in the state of Ohio, under the provisions of said act of Congress, and collected for said service, in accordance with the provisions of said act, the following sums of money:

"For receiving and filing declarations of intention and issuing duplicates thereof, $4,878.

"For making, filing and docketing petitions of aliens for admission as citizens of the United States, and for the final hearing thereon, $4,876.

"For entering the final orders and the issuing of certificates of citizenship thereunder, $4,876.

"Pursuant to the provisions of said act of Congress, portions of said fees so collected, aggregating the sum of $8,630, were from time to time paid over to the Bureau of Immigration and Naturalization by said Charles S. Horner, and the balance of said fees, aggregating $6,000, was retained by him.

"No part of said $6,000, so retained by said Charles S. Horner, has been paid into the treasury of Cuyahoga county by him, but said entire sum has been illegally withheld therefrom, and there is now due and owing to the county of Cuyahoga from said Charles S. Horner, and from the Bankers Surety company as his bondsman, the sum of $6,000, together with interest there-

on at the rate of 6 per cent. per annum upon the different portions of said sum from the dates at which said portions were payable to the treasury of the county."

The defendant, Charles S. Horner, files a general demurrer to that first cause of action. The defendant the Bankers Surety Company also files a general demurrer to that first cause of action. A hearing on said demurrers has been had, briefs filed in addition, and this opinion gives the court's reasons for its decision on these demurrers.

For many years back, until a comparatively recent period, county officers, including the clerk of the court, received their compensation from fees, percentages, costs, allowances and perquisites. Public attention became attracted to this method of compensation, and it became the public thought that such method was wrong in principle, and should be changed so that such officers would receive, for performing the duties of their respective offices, a stipulated, fixed annual salary. Such public thought became so general that the Legislature, in obedience to the public demand, enacted laws on the subject, now know in common parlance as "salary laws." Whether or not such laws did entirely change such compensation from the former "fee system," so-called, to a "salary system," is necessarily involved in deciding the question at issue.

In March, 1906, the Legislature passed an act entitled "an act to fix the salaries of probate judges, county auditors, county treasurers, county recorders, clerks of the court of common pleas, and sheriffs, and to provide for the employment and compensation of their clerks, deputies and assistants." By its terms, said act took effect January 1, 1907. Said act is found in the 98th volume of Ohio Laws, page 89.

On February 15, 1910, the General Code of Ohio became operative, in which Section 1 of the act of 1906 is found as Section 2977. Said Section 1 is carried into Page & Adams Annotated Ohio General Code as Section 2977. Section 2977 of the General Code, and the same of Page & Adams Annotated Ohio General Code, are identical in language, and read as follows:

"Section 2977.   All the fees, costs, percentages, penalties, allowances and other perquisities collected or received by law as compensation for services by a county auditor, county treasurer, probate judge, sheriff, clerk of courts, or recorder, shall be so received and collected for the sole use of the treasury of the county in which they are elected and shall be held as public moneys belonging to such county, and accounted for and paid over as such, as hereinafter provided."

Said Section 1 of the act of 1906 reads as follows:

Section 1.   "All the fees, costs, percentages, penalties, allowances, and all other perquisites of whatever kind which by law ·· may now be collected or received as compensation for services by any county auditor, county treasurer, probate judge, sheriff, clerk of courts, or recorder, shall be received and collected by all of said officers and each of them for the sole use of the treasurer of the county in which they are collected, and shall be held as public moneys belonging to said county, and accounted for and paid over as such in the manner hereinafter provided."

While the. language of the original act differs in some respects from that of said Section 2977, I think the meaning is the same.

At the time said Section 1 was enacted there was also enacted Section 5 of the same, which finds a place in the General Code and in Page & Adams Annotated Ohio General Code as Section 2982, and reads as follows:

"Section 2982.   Each of such officers shall keep full and regular accounts of all official fees, costs, percentages, penalties, allowances or other perquisites charged or collected by him, and such accounts shall be records of the offices, shall belong to the county, and shall be transmitted by such officer to his successor in office.   At all times such accounts shall be subject to the examination of the county commissioners, the judge or judges of the court of common pleas, or any person appointed for that purpose by the judge or judges, or of any person authorized by law to make such examination, or of any other person."

At the time said Sections 1 and 5 were enacted, there were enacted Sections 11, 12, 13, 14 and 15, which sections find a place in Page & Adams Annotated Ohio General Code as Sec-

tions 2989, 2990, 2991, 2992 and 2993. Said sections read as follows:

"Section 2989. Each county officer herein named shall receive out of the general county fund the annual salary hereinafter provided, payable monthly upon warrant of the county auditor.

"Section 2990. Each auditor shall receive    *    *    *.

"Section 2991. Each treasurer shall receive    *    *    *.

"Section 2992. Each probate judge shall receive    *    *    *.

"Section 2993. Each clerk shall receive eighty-five dollars for each full one thousand of the first fifteen thousand of the population of the county, as shown by the last federal census next preceding his election; sixty dollars per thousand for each full one thousand of the second fifteen thousand of such population of the county; fifty dollars per thousand for each full one thousand of the third fifteen thousand of such population of the county; forty dollars per thousand for each full one thousand of the fourth fifteen thousand of such population of the county; thirty dollars per thousand for each full one thousand of the fifth fifteen thousand of such population of the county; twenty dollars per thousand for each full one thousand of the sixth fifteen thousand of such population of the county; and five dollars per thousand for each full one thousand of such population of the county, in excess of ninety thousand."

Said Section 2993 is substantially the same, and exactly the same in principle, as is Section 15 of the act of 1906.

At the time said Sections 1 and 5 were enacted, there was enacted Section 18, which section finds a place in the General Code and in Page & Adams Annotated Ohio General Code at Section 2996, which reads as follows:

"Section 2996. Such salaries shall be instead of all fees, costs, penalties, percentages, allowances and all other perquisites of whatever kind which any of such officials may collect and receive, provided that in no case shall the annual salary paid to any such officer exceed six thousand dollars."

The language of said Section 18 and Section 2997 is substantially the same, and the meaning is precisely the same.

The original act, Section 18, provides,—"and said salaries shall be *in lieu* of all fees," etc., and in Section 2996 the language is "such salaries shall be *instead* of all fees," etc. There is no difference between the meaning of the words "in lieu of" and "instead of." The definition of "instead" in the Century Dictionary and Cyclopedia is as follows: "in the stead; in place or room; hence in equivalence or substitution." The same authority defines "lieu" as follows: "place, room, stead; now only the phrase *in lieu of*, which is equivalent to *instead of*."

The cause of action is based upon the fact that the defendant Charles S. Horner, as clerk, acting under and by virtue of an act of Congress enacted June 29, 1906, performed certain duties in connection with the naturalization of aliens, and charged and collected certain fees for the performance of said services, and after paying over to the Bureau of Immigration and Naturalization of the United States the sum of $8,630, received from such source, retained a balance so received in the sum of $6,000, which he claims he has a right to retain as his own, and which the relator claims belongs to the treasury of the county.

The defendant Horner claims he is authorized to retain such fees as his own by virtue of the reading of the Ohio salary law (in a particular to be hereafter noted), and the reading of the United States naturalization act. Said naturalization act is found in Page & Adams Annotated Ohio General Code, Vol. 6, page 1307, and is known as the act of the Fifty-Ninth Congress passed in 1906, and is entitled, "An act to establish a bureau of immigration and naturalization, and to provide for a uniform rule for the naturalization of aliens throughout the United States."

The sections of said act which need to be noted here are Sections 3, 5 and 13, reading as follows:

"Section 3. That exclusive jurisdiction to naturalize aliens as citizens of the United States is hereby conferred upon the following specified courts: United States circuit and district courts now existing, or which may hereafter be established by Congress in any state; United States district courts for the territories of Arizona, New Mexico, Oklahoma, Hawaii, and Alaska,

the Supreme Court of the District of Columbia, and the United States courts for the Indian Territory; also all courts of record in any state or territory now existing, or which may hereafter be created, having a seal, a clerk and jurisdiction in actions at law or equity, or law and equity, in which the amount in controversy is unlimited. That the naturalization jurisdiction of all courts herein specified, state, territorial, and federal, shall extend only to aliens resident within the respective judicial districts of such courts.

"The courts herein specified shall, upon the requisition of the clerks of such courts, be furnished from time to time by the bureau of immigration and naturalization with such blank forms as may be required in the naturalization of aliens, and all certificates of naturalization shall be consecutively numbered and printed on safety paper furnished by said bureau.

"Section 5. That the clerk of the court shall, immediately after filing the petition, give notice thereof by posting in a public and conspicuous place in his office, or in the building in which his office is situated, under an appropriate heading, the name, nativity, and residence of the alien, the date and place of his arrival in the United States, and the date, as nearly as may be, for the final hearing of his petition, and the names of the witnesses whom the applicant expects to summon in his behalf; and the clerk shall, if the applicant requests it, issue a subpoena for the witnesses so named by the said applicant to appear upon the day set for the final hearing, but in case such witnesses can not be produced upon the final hearing other witnesses may be summoned.

"Section 13. That the clerk of each and every court exercising jurisdiction in naturalization cases shall charge, collect, and account for the following fees in each proceeding:

"For receiving and filing a declaration of intention and issuing a duplicate thereof, one dollar.

"For making, filing and docketing the petition of an alien for admission as a citizen of the United States and for the final hearing thereon, two dollars; and for entering the final order and the issuance of the certificate of citizenship thereunder, if granted, two dollars.

"The clerk of any court collecting such fees is hereby authorized to retain one-half of the fees collected by him in such naturalization proceeding; the remaining one-half of the naturalization fees in each case collected by such clerks, respectively, shall be accounted for in their quarterly accounts, which they are hereby required to render the bureau of immigration and

naturalization, and paid over to such bureau within thirty days from the close of each quarter in each and every fiscal year, and the moneys so received shall be paid over to the disbursing clerk of the department of commerce and labor, who shall thereupon deposit them in the treasury of the United States, rendering an account therefor quarterly to the auditor for the state and other departments, and the said disbursing clerk shall be held responsible under his bond for said fees so received.

"In addition to the fees herein required, the petitioner shall, upon the filing of his petition to become a citizen of the United States, deposit with and pay to the clerk of the court a sum of money sufficient to cover the expenses of subpoenaing and paying the legal fees of any witnesses for whom he may request a subpoena, and upon the final discharge of such witnesses, they shall receive, if they demand the same from the clerk, the customary and usual witness fees from the moneys which the petitioner shall have paid to such clerk for such purpose, and the residue, if any, shall be returned by the clerk to the petitioner: Provided, That the clerks of courts exercising jurisdiction in naturalization proceedings shall be permitted to retain one-half of the fees in any fiscal year up to the sum of three thousand dollars, and that all fees received by such clerks in naturalization proceedings in excess of such amount shall be accounted for and paid over to said bureau as in case of other fees to which the United States may be entitled under the provisions of this act.

"The clerks of the various courts exercising jurisdiction in naturalization proceedings shall pay all additional clerical force that may be required in performing the duties imposed by this act upon the clerks of courts from fees received by such clerks in naturalization proceedings. And in case the clerk of any court collects fees in excess of the sum of six thousand dollars in any one year, the secretary of commerce and labor may allow to such clerk from the money which the United States shall receive additional compensation for the employment of additional clerical assistance, but for no other purpose, if in the opinion of the said secretary the business of such clerk warrants such allowance."

In part the defendant Horner bases his claim to retain the naturalization fees as his own upon the words "collected or received by law," found in Section 2977, he claiming the words

"by law" mean by the *laws of the State of Ohio;* and inasmuch as the fees in controversy are earned by virtue of a law of the United States, such fees do not come under and are not disposed of by Ohio salary law, and are *"ultra"* such law.

This claim requires a construction of the Ohio salary law, so-called.

"The office of construction, when a statute is the subject of it, is to ascertain the legislative will.    *    *    *    'The intention of the law-makers may be collected from the cause or necessity of the act, and statutes are sometimes construed contrary to the literal meaning of the words.    *    *    *    The letter is sometime restrained, sometimes enlarged, and sometimes the construction is contrary to the letter.'    *Burgett* v. *Burgett*, 1 Ohio, 480."

Section 2977 must be read and construed in connection with Sections 2982 and 2996.    Section 2996 says:

"Such salaries shall be *instead* of *all* fees, penalties, percentages, allowances, and all other perquisites of whatsoever kind which any of said officials may collect and receive, provided in no case shall the annual salary paid to any such officers exceed six thousand dollars."

From what has been said before on this subject of changing the compensation from a fee basis to a salary basis, and keeping in mind the rule of construction hereinbefore outlined, and gathering the meaning of the law on the subject from a reading of all the sections on the subject, I feel the contention of the defendant can not, by any provision of the Ohio laws, be maintained.    My view on this subject is, in my opinion, strengthened by a reading of the case of *State, ex rel,* v. *Kennedy et al,* decided by the Supreme Court of Ohio on March 17, 1914.    The construction of the sections of the General Code above was before the court in that case.    The syllabus of that case reads as follows:

"1.    The salary law, Sections 1292-11 to 1298, Revised Statutes (now Sections 2977 to 3004, General Code), which commands that the county auditor shall receive as public money

for the sole use of the county, and pay into the county treasury quarterly, all fees, costs, percentages, penalties, alowances and perquisites of whatever kind collected by his office as compensation for services, and that such officer shall receive out of the general county fund, a designated annual salary, which shall be instead of such fees, etc., and all other perquisites which such officer may collect, forbids the recorder to retain for his own use and benefit any compensation awarded him by the county commissioners for making general indexes under favor of Sections 1154 and 1158, Revised Statutes (modified in Sections 2768 and 2780, General Code).

''A county recorder who fails to pay over to the county treasurer, and appropriates to his own use, any money so collected and received by him, is liable jointly upon his bond for the recovery of the money so retained, with interest from the end of the quarter in which such funds were collected.''

The opinion is too voluminous to insert in full, so I content myself with quoting the following therefrom:

''But the defendants quote from Sections 2977 and 3000, and argue that these sections prescribe determinate charges required by law to be collected as fees from patrons of the office in the regular and ordinary course of business, which properly go to the accumulated 'fee fund' turned into the treasury, whereas the making of general indexes is extra work, and the compensation thereof is not determined by law, but is a variable perquisite allowed by the commissioners which the statute authorizes him to draw out of the treasury for his personal benefit. And they contend that it is absurd to say that the one statute allows him to draw the money out and the other requires him immediately to pay it back into the treasury. The simple answer to this contention is, that the later statute commands that all fees, allowances and other pʳequisites of the office granted by the former statute as the recompense of service in that office shall be collected by the officer as formerly, wthout remission or diminution, and by him paid into the treasury, and *in lieu thereof* he shall receive an annual salary. This accumulation of fees, allowances, prequisites, etc., in the treasury, becomes a fund for the payment for such assistants in his office as may be needful to the proper discharge of its duties.

''This rational scheme was adopted as a convenient method of transition from the fee system to the salary system, without

disturbing or diminishing the revenues of the office, which now go to the public treasury. The criticism which the defendants make upon the new system is essentially an animadversion upon the legislative policy of these statutes and nothing more. We have naught to do with that policy but to declare and enforce it. We can not modify and cripple it, under the guise of interpretation, to appease the defendant's notions of its unreason and unfairness, however wise or otherwise the defendants may be in such matters. Statutes may be cut and shuffled and rearranged so as to appear incongruous, but this is not the proper method of legal construction. We must read them as they are phrased and arranged by the Legislature. Some of the statutes brought under review in this case are found under the chapter entitled 'County Recorder,' defining the term revenues and duties of the office; others have been placed in the chapter entitled 'Salaries of County Officers.' The same arrangement is pursued in the General Code. The statute defining the salary system is later than the statute prescribing the schedule of fees. If there is any intrinsic conflict, the latter enactment would prevail, and the provisions regarding fees, compensation and allowances would give way to expression of legislative intent in the statute prescribing salaries. But a comprehensive view of the two chapters reveals a harmonious and consistent legislative plan which calls for no textual criticism or legal construction. The language needs no interpretation, because it is simple and positive and its meaning is plain, namely, the county officers shall derive no other emolument from their offices than the definite salary prescribed by law."

It remains to see whether the act of Congress of 1906 gives the clerk, as his own, the fees in naturalization cases.

Section 3 of the act "confers" jurisdiction on courts of common pleas in naturalization.

Section 5 provides for the posting of notices in the office of the clerk of the name, etc., of the alien, and provides for the issuing of subpoenas for witnesses.

Section 13 of the act provides what fees shall be charged, collected and accounted for.

The clerk is put to no expense, except for extra clerk hire, and that is paid from the fees; he does his work in a court house furnished by the county; the blanks are furnished by the

United States; the judge hearing the case gets no extra compensation by reason of sitting in naturalization cases.

Section 13 reads:

''That the clerk of each and every court exercising jurisdiction in naturalization cases shall charge, collect and account for the following fees in each proceeding.''  *   *   *

Can it be a fair construction to say that the United States government undertook to regulate the domestic affairs of the states, and to enact a law in variance with the public policy of any of the states? Or would it not be fairer to say that all the United States undertook to mean was, that it prescribes what fees may be charged and collected by the clerk, and that he must account for such part thereof as is not turned over to the Bureau of Immigration and Naturalization according to the laws of the various states? That the United States intended that in a state where the clerk is paid by fees, he gets the fees on naturalization cases, and in a state where the clerk is paid by salary, that he shall receive the fees as clerk and account for them to the proper public officer, according to the laws of the state putting him on a salary basis.

This construction seems to me to be the proper one, and it seems to me that this construction is borne out by the case of *Harry I. Mulcrevy and Fidelity & Deposit Company of Maryland v. City and County of San Francisco,* decided by the Supreme Court of the United States on January 5, 1913. Justice McKenna delivered the opinion of the court in the case, and says:

''Action brought in the superior court of the city and county of San Francisco against plaintiffs in error to recover from them the sum of $2,972, with interest from certain dates, received by plaintiff in error Mulcrevy in his official capacity as county clerk and *ex-officio* clerk of the Superior Court of the City and County of San Francisco in certain naturalization proceedings. Judgment was rendered on the pleadings against plaintiff in error. It was affirmed on appeal.

''Mulcrevy was elected county clerk of the city and county of San Francisco at the November election, 1905, for the term

of two years commencing January 8, 1906. He duly filed his official bond with plaintiff in error, the Fidelity & Deposit Company of Maryland, his surety, which was conditioned that he should faithfully perform all official duties which were then or thereafter might be imposed upon him by law, ordinances, or the charter of the city and county. His salary was fixed by the charter at the sum of $4,000 and it was provided as follows: 'The salaries provided in this charter shall be in full compensation for all services rendered, and every officer shall pay all moneys coming into his hands as such officer, no matter from what source derived or received, into the treasury of the city and county of San Francisco within twenty-four hours after the receipt of the same.'

"By his election Mulcrevy became *ex-officio* the clerk of the superior court. After he had entered upon the discharge of his duties, on the 29th of June, 1906, Congress passed an act entitled 'An act to establish a Bureau of Immigration and Naturalization, and to provide for a uniform rule for the naturalization of aliens throughout the United States.' Jurisdiction in naturalization proceedings was conferred by the act on the federal courts and certain state courts, and the duties of the clerks were set forth. Fees were prescribed and it was provided that the clerks of the courts collecting them were authorized to retain one-half thereof, the other half to be accounted for in their quarterly accounts which they were required to make to the Bureau of Immigration and Naturalization. The amount retained by the clerk, however, it was provided should not exceed in any one fiscal year the sum of $3,000. If fees in excess of $6,000 be collected in any one year the clerk might be allowed by the Secretary of Commerce and Labor additional compensation for additional clerical assistance out of the moneys received by the United States.

"Under the provisions of the act as clerk of the superior court in naturalization proceedings, Mulcrevy collected $5,944 and accounted for one-half thereof as required by the act. The other half he kept for himself, his contention being that it was intended for himself by the act of Congress as pay for his extra work and clerical assistance, the fees not having been received by him in his official capacity, but merely as an agent designated by the act of Congress to perform services in naturalization proceedings.

"It appears from the opinion of the district court of appeal that the total salary list fixed and allowed to Mulcrevy's office

amounts to $58,600. And it is provided by the charter that when an officer shall require additional deputies, clerks or employees the same may be allowed by supervisors if upon investigation the mayor determines the same to be necessary.    *    *    *

"On the merits, the case presents no difficulty. It involves only the construction of the act of Congress already referred to above. We accept the state court's construction of the charter of the city and county of San Francisco. Indeed, its clearness leaves no room for construction. The salary it provides is declared to be 'in full compensation for all services rendered.' And it is provided that 'every officer shall pay all moneys coming into his hands as such officer, no matter from what source derived or received, into the treasury of the city and county.' The provisions are complete and comprehensive and express Mulcrevy's contract with the city, the performance of which his office imposed upon him; and, of course, the fees received by him in naturalization proceedings, because he was clerk of the superior court, were in compensation for official acts, not personal acts.

"But it is contended by plaintiff in error that the fees having been received offically is not of importance; that nevertheless he acted as the representative of the United States in execution of the policies of the United Stats and being by the act of Congress invested with his powers he is entitled for himself to the compensation prescribed by the act for their execution, without any liability to account for them in the city. The last proposition, however, does not follow from the others, and the others are but confusing. If it be granted that he was made an agent of the National Government, his relations to the city were not thereby changed. He was still its officer, receiving fees because he was, not earning them otherwise or receiving them otherwise, but under compact with the city to pay them into the city treasury within twenty-four hours after their receipt.

"Under the contention of plaintiffs in error, a rather curious situation is presented. Mulcrevy was elected to an office constituted by the municipality under the authority of the state. He was given a fixed salary of $4,000 with the express limitation that it should be his complete compensation. He agreed that all other moneys received by him officially should be paid into the treasury of the city. He was given office accommodations, clerks to assist him, and yet contends that notwithstanding such equipment and assistance, notwithstanding his compact, he may retain part of the revenues of his office as fees for his own per-

sonal use. We can not yield to the contention. Nor do we think the act of Congress compels it. The act does not purport to deal with the relations of a state officer with the state. To so construe it might raise serious questions of power, and such questions are always to be avoided. We do not have to go to such lengths. The act is entirely satisfied without putting the officers of a state in antagonism to the laws of the state—the laws which give them their official status. It is easily construed and its purpose entirely accomplished by requiring an accounting of one-half of the fees to the United States, leaving the other half to whatever disposition may be provided by the state law. Counsel cite some state decisions which have construed the act of Congress as giving a special agency to the clerks of the state courts and as receiving their powers and rights from the national enactment. The reports of the Department of Commerce and Labor are quoted from, which, it is contended, exhibit by their statistics and recommendations the necessity of national control. State decisions expressing a contrary view are frankly cited. This contrariety of opinion we need not further exhibit by a review of the cases. We have expressed our construction of the act, and it is entirely consonant with the purpose of the act and national control over naturalization. Judgment affirmed.''

It follows that the demurrer filed by Charles S. Horner must be and is overruled; and the rights of the Bankers Surety Company being no different from those of its principal, its demurrer is overruled.